Filed 3/1/21  P. v. Torres CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEONEL ADRIAN TORRES,<br><br>    Defendant and Appellant. | 2d Crim. No. B302227<br>(Super. Ct. No. 18CR80029)<br>(Santa Barbara County) |

Leonel Adrian Torres appeals the judgment entered after a jury had convicted him of second degree murder.  (Pen.Code, §§ 187, subd. (a), 189).[1]  The jury found true an allegation that he had committed the crime for the benefit of a criminal street gang.

_____

[1] Unless otherwise stated, all statutory references are to the Penal Code.

(§ 186.22, subd. (b)(1).)  He was sentenced to prison for 15 years to life.[2]

Appellant contends that the evidence is insufficient to support his murder conviction.  In addition, he claims that the trial court erroneously (1) excluded testimony by his expert witness, and (2) denied his request for an instruction on accomplice testimony.  We affirm.

*Facts*

Appellant, Arturo Palomar, Jose Morales, and Miguel Aguilera were members of the Guadalupe criminal street gang.  Francisco Rodriguez was an associate of the gang.  The gang claimed as its territory the small city of Guadalupe in the County of Santa Barbara.

Appellant's gang moniker was "Travieso," which "means trouble maker" in Spanish.  Erica Venegas, who was dating appellant, said she knew he "was a shot caller" because "other gang members would do what he told them to do."  They "looked up to" appellant.

In August 2008 appellant, Palomar, Morales, Aguilera, and Rodriguez drove in Palomar's vehicle to a liquor store in Guadalupe to buy beer.  Aguilera remained in the vehicle while his companions walked into the store.  Aguilera and Rodriguez testified at trial as prosecution witnesses.

---

[2] This is the prescribed punishment for second degree murder.  (§ 190, subd. (a).)  No additional punishment could have been imposed for the gang enhancement.  (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 320 ["The gang enhancement provision does not . . . increase the maximum term of imprisonment for felonies punishable by life imprisonment"].)

2

The victim, James Christie, entered the store to buy a beer but quickly walked outside. Christie was a member of the Northwest gang in Santa Maria. Appellant asked him, "'[W]here you from?'" or "'[W]ho the fuck are you?'" Christie responded, "'Wicked from Santa Maria Northwest.'" Rodriguez explained the significance of Christie's response: "Northwest and Guadalupe are rival gangs. So usually if somebody from Santa Maria is in Guadalupe . . . , there's going to be a fight or some kind of confrontation." "Just the fact that [someone from Santa Maria Northwest is] there is disrespect[ful]" to the Guadalupe gang. The gang thinks "that they own [the city of] Guadalupe."

Rodriguez continued: Appellant took a swing at Christie, and then "they both start[ed] swinging at each other." Morales and Palomar were "trying to pick shots [at Christie] while [appellant] was trying to fight with him." "Christie knew it wasn't going to be a fair fight at that point [so] . . . he was just backing up."

Rodriguez said, "'[H]ey, just let them fight one on one.'" Appellant and Christie walked into the middle of the street and started fighting "one on one." Appellant "grabbed [Christie] by the waist, picked him up and tried to slam him" into the asphalt street. Both fell to the ground. Palomar "threw a kick" at Christie while he was on the ground. Christie stood up, and Aguilera threw a bottle at him. The bottle missed Christie and broke on the ground behind him.

Christie "started backing up towards the door" of the store. Morales, Palomar, and appellant pursued him. Morales and appellant kicked Christie. Palomar "threw a punch."

In an attempt to stop the fight, Rodriguez put himself between Christie and his pursuers. Appellant was "trying to get

around [Rodriguez] to get closer to Mr. Christie to . . . re-engage him."

Rodriguez asked Christie, "'[W]hat you got going on here, Wicked?'" Christie responded that he was visiting his cousin, Guero, "'from Northwest, Santa Maria Northwest,'" the same gang to which Christie belonged.

In a loud voice Rodriguez said to Christie, "'[W]hy don't you just go inside with the cameras.'" Rodriguez was referring to surveillance cameras inside the store. He wanted to let everyone "know that we were all incriminating ourselves on camera right now, and if anything did happen, we were all going . . . to go down the river for it." Christie went inside the store, and Aguilera told him to stay there. Rodriguez and Aguilera walked away toward Palomar's vehicle.

Palomar retrieved a knife from the vehicle's glove compartment and appeared to put it in his back pocket. He "position[ed] himself [outside] on the right side of the door" to the store.

Christie started to walk out of the store toward appellant. "[T]hey were both looking at each other ready to start another confrontation with each other." Christie could not see Palomar standing outside at the side of the doorway. Rodriguez testified: "And once [Christie] walked out of that doorway looking right at [Torres], that's when I seen Art Palomar lunge at [Christie] with what I thought was a sucker punch [to the right upper chest] until he pulled back . . . [and] I could see the knife come out all full of blood." "[I]t was just a big knife that needed to be in a sheath."

4

The knife cut two blood vessels, including the superior vena cava, which drains blood from the neck into the heart. Christie bled to death.

After the stabbing, appellant immediately "turn[ed] around and bolt[ed] off . . . towards the store that was across the street." Everyone entered Palomar's vehicle, which drove away.

Aguilera testified that he "had no idea" that Palomar was going to stab Christie. "I've never seen him do anything like that." However, after the incident Aguilera told Rodriguez that Palomar had asked him to get the knife from the car. Aguilera refused. He "told [Palomar] to leave that shit in there."

Appellant fled to Mexico. In 2016 he was extradited to the United States.

*Gang Culture*

Deputy Steven Gonzales, a gang expert, testified: The "3 R's" of the gang world are "[r]espect, retaliation and reputation." A gang member will kill to gain respect or avoid being disrespected. One way of gaining respect is to attack a rival gang member.

If a member of the Guadalupe gang asked someone where he was from and the person responded that he was from a rival gang, a fight would ensue. If the rival gang member does not back down, "[t]here's going to be escalation." Guadalupe gang members will "pick up a weapon, a knife, or anything they can get their hands on . . . to inflict more damage." A gang member who uses a weapon gains respect because "[h]e is reverting to whatever he can to win a fight."

If Christie had "pretended to be knocked out, they probably would have left him alone. But he refused to go down. He was a true fighter. [¶] . . . [T]he three [Guadalupe gang members] that

were jumping him . . . couldn't get the job done.  Therefore they are going to need weapons to end it . . . ."

Rodriguez testified:  In refusing to back down, Christie "acted like a good gang member."  "[I]n terms of the gang culture," the Guadalupe gang members "had to escalate and they did exactly what they were supposed to do."  They would "have lost face" if Christie had been able to hold his own against them.  By fighting back, Christie showed disrespect for the Guadalupe gang.  "He should have been running."  "We expect our gang to be feared."  The Guadalupe gang members had "to make sure that he has some kind of bodily harm done to him."  They would be expected "to escalate . . . to weapons if they couldn't handle it with their fists."  If a Guadalupe gang member kills a rival gang member, "[i]t brings a lot of respect to the [Guadalupe] gang" as well as to the killer.

*Prior Appellate Court Decision*

In a nonpublished opinion, *People v. Palomar et al.* (B226769, Jan. 9, 2012), we affirmed the judgments entered after a jury had convicted Palomar of first degree murder and Morales of second degree murder.  The issues in the prior appeal are different from those in the present appeal.

*Jury Instructions: Different Theories of Second Degree Murder*

The jury was instructed on two different theories of second degree murder:  direct aiding and abetting, and implied malice.  "[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.'"  (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*).)  "[D]irect aiders and abettors of

6

murder . . . necessarily 'know and share the murderous intent of the actual perpetrator.'" (*People v. Offley* (2020) 48 Cal.App.5th 588, 596.) On the other hand, "[i]mplied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653 (*Gonzalez*).)

Appellant contends: "The record does not disclose which theory the jury relied on in convicting [him] of second degree murder. Thus, this Court must determine whether there was sufficient evidence supporting his conviction under each theory of second degree murder." Appellant is mistaken. "Generally speaking, '[w]hen a jury is instructed on two theories of first [or second] degree murder, a first [or second] degree murder verdict will be upheld [even] if there is insufficient evidence as to one of the theories.' [Citation.] In such cases, where 'the inadequacy of proof' as to one of the theories of . . . murder is 'purely factual,' it is presumed that the jury is 'fully equipped to detect' the deficiency and must have relied on the other, factually valid theory. [Citation.] [¶] But this presumption does not apply if there is 'an affirmative indication in the record that the verdict actually did rest on the inadequate ground.'" (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1021.)

As appellant acknowledges, "[t]he record [here] does not disclose which theory the jury relied on . . . ." Thus, we will affirm if either theory of murder is supported by substantial evidence. As we explain below, substantial evidence supports the implied malice theory of second degree murder. We therefore need not consider whether substantial evidence also supports

7

appellant's conviction on the alternative theory that he was a direct aider and abettor of the murder.

*Implied Malice Theory Survives Senate Bill 1437*

"In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) . . . ." (*Gentile, supra,* 10 Cal.5th 830, 838.)  Senate Bill 1437 eliminated murder liability under the natural and probable consequences doctrine. (*Id.* at pp. 843, 847-848.)  Pursuant to this doctrine, "an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of the crime the accomplice aided and abetted (i.e., the nontarget offense)." (*Id.* at p. 843.)

The implied malice theory of second degree murder contains a "natural and probable consequences" element – the perpetrator must willfully commit "an act, the natural and probable consequences of which are dangerous to human life . . . ." (*Gonzalez, supra,* 54 Cal.4th at p. 653.)  This element is distinct from the natural and probable consequences *doctrine,* which "allowed [a defendant] to be convicted of murder without personally possessing malice aforethought.  So long as the direct perpetrator possessed malice, and the killing was a natural and probable consequence of the crime the defendant aided and abetted, it did not matter whether the defendant intended to kill or acted with conscious disregard for human life." (*Gentile, supra,* 10 Cal.5th at p. 845.)  Unlike the natural and probable consequences doctrine, "[f]or implied malice, the intent requirement is satisfied by proof that the actual perpetrator "'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.'" [Citation.]  Therefore,

8

notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life."  (*Id.* at p. 850.)

*Substantial Evidence Supports Conviction*

*Based on Implied Malice Theory*

Appellant claims that the evidence is insufficient to support his conviction of second degree murder based on an implied malice theory.  "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

There are two prongs to the implied malice theory.  The first prong is that "a person willfully does an act, the natural and probable consequences of which are dangerous to human life . . . ."  (*Gonzalez, supra*, 54 Cal.4th at p. 653.)  Appellant argues that the evidence is insufficient to support the first prong: "Certainly, there was a danger of great bodily injury because four gang members were engaged in a weaponless fight with a rival gang member.  But the danger was not to human life.  'Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible.' [Citation.]  [¶]  Here it was merely possible that Christie would end up dead."

We disagree.  A reasonable trier of fact could find beyond a reasonable doubt that the natural and probable consequences of appellant's acts were dangerous to human life.  Appellant issued a gang challenge to Christie when he said, "'[W]here you from?'" or "'[W]ho the fuck are you?'"  Deputy Gonzales explained:  "He is protecting his town.  He is protecting his territory."  Gonzales opined that, if Christie said he was from a rival gang, he was "going to get jumped" by appellant and the other Guadalupe gang members.  This is exactly what happened.

Appellant and the other Guadalupe gang members could not reasonably expect that Christie would retreat from the fight.  If he had retreated, he would have lost face within his own gang.  Deputy Gonzales opined that Christie did what a gang member is "expected to do.  They fight and they fight to the death . . . ."  Another gang expert, Detective Michael Parker, testified that a gang member who did not stand up to rival gang members would be "disrespecting [his] own gang by [his] failure to act" and could be "kicked out of the gang."

Deputy Gonzales explained that, if Christie did not back down, "[t]here's going to be escalation."  If the Guadalupe gang members had allowed Christie to defy them without suffering harm, they would have lost face within their gang.  Thus, they had "to find a way to put him down."  The gang members who "were jumping him . . . couldn't get the job done.  Therefore they are going to need weapons to end it; i.e., knives, bottles, bats, brass knuckles, anything you can get your hands on to cause more damage to make this guy go down."

The second prong of implied malice is that "the person knowingly acts with conscious disregard for the danger to life that the act poses."  (*Gonzalez, supra*, 54 Cal.4th at p. 653.)

10

Appellant argues that he "engaged in the fistfight with Christie with the intent to hurt him, perhaps hurt him badly, but acted with only conscious disregard of the risk of serious bodily injury, not conscious disregard of the danger to human life."

A reasonable trier of fact could find beyond a reasonable doubt that appellant knowingly acted with conscious disregard for the danger to life that his acts posed. As a gang member, he must have known that the answer to his challenge "'[W]here you from?'" or "'[W]ho the fuck are you?'" could lead to violence. (See *People v. Medina* (2009) 46 Cal.4th 913, 922 (*Medina*) [former gang member testified that "a gang member's query 'where are you from?' means 'what gang are you from?' and is a verbal challenge, which (depending on the response) could lead to a physical altercation and even death"].) When Christie answered that he was from a rival gang, appellant started the fight by throwing the first punch. In closing argument to the jury, appellant's counsel said, "[Appellant] started the fight, he knows if he hadn't started that fight Mr. Christie would most likely be alive today."

Appellant surely knew that, if he started a fight with a rival gang member, the other Guadalupe gang members would come to his assistance. "Once the fight ensued, the three men [appellant, Morales, and Palomar] could not get [Christie] down. Despite being attacked and outnumbered by three aggressors, [Christie] defended himself well and held his own. . . . Given the gang-related purpose of the initial assault and the fact that, despite being outnumbered, [Christie] exhibited strength against three aggressors who could not avenge themselves in response to what they considered disrespectful behavior by [Christie], the jury could reasonably have found that a person in [appellant's]

11

position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable . . . ." (*Medina*, *supra*, 49 Cal.4th at pp. 922-923.)

Appellant's continuation of the fight under these circumstances showed a conscious disregard for Christie's life. "Given the great potential for escalating violence during gang confrontations, it is immaterial whether [appellant] specifically knew [Palomar] had a [knife]." (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) Deputy Gonzales testified that gang members commonly use weapons during gang fights. Gonzales opined: "Any [kind] of gang fight can go bad." A "guy could get stabbed and get killed." Rodriguez testified that the Guadalupe gang members would be expected "to escalate . . . to weapons if they couldn't handle it with their fists."

Appellant had personal experience of how a gang confrontation can lead to the use of deadly force. When appellant was a 17-year-old gang member, he "had been stabbed in the back and suffered a punctured lung." The stabbing was gang related.

Appellant and Rodriguez recorded a gangster rap song that shows appellant knew disrespect by a rival gang member, such as Christie, could have deadly consequences. The song includes the lyrics, "'[I]f he ain't showin' respect we will loc[k] that ese with a tech.'" The lyrics mean that, if a rival gang member fails to show respect for Guadalupe gang members, they will shoot the rival gang member with a TEC-9, a semiautomatic firearm.

*Exclusion of Defense Expert's Testimony on Crime Statistics*

Dr. Edwina Barvosa was one of appellant's expert witnesses. Appellant argues that the trial court erroneously

12

excluded her testimony concerning statistics for nonhomicide violent offenses, such as assaults, committed in Guadalupe. Defense counsel told the trial court that the statistics would show "there's a very low crime rate in Guadalupe, specifically homicides. There was [only] one from 2001 to 2017." Thus, Guadalupe is "a great place to live in terms of crime rates typically. [And] that is relevant to [appellant's] subjective knowledge of what happens in Guadalupe." Because the gang assault against Christie occurred in Guadalupe, counsel argued that the natural and probable consequences of the assault were not dangerous to human life. Counsel stated, "[H]ere in sleepy Guadalupe this stuff [a murder] never happens. . . . No one ever dies." "It's far more foreseeable [that someone is probably going to die] . . . in an area where there's far more crime." We take judicial notice that, according to the United States Census Bureau, in April 2010 the population of Guadalupe was 7,080. <https://www.census.gov/quickfacts/fact/table/guadalupecitycalifornia/POP010210 > [as of Jan. 5, 2021], archived at <https://perma.cc/57H9-3FVX>.

The trial court allowed Dr. Barvosa to testify that, with the exception of the killing of Christie, no homicides were committed in Guadalupe between 2001 and 2008. The court did not allow her to testify concerning the crime rate for assaults in Guadalupe during this period.

"In general, we review the trial court's exclusion of evidence for abuse of discretion." (*People v. Herrera* (2016) 247 Cal.App.4th 467, 475.) The trial court did not abuse its discretion. Only relevant evidence is admissible. (Evid. Code, § 350.) "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is

13

of consequence to the determination of the action."  (*Id*., § 210.) Evidence that Guadalupe had a low crime rate for assaults did not have a tendency in reason to disprove implied malice, i.e., disprove that the natural and probable consequences of the gang assault against Christie were dangerous to human life and that appellant knowingly acted with conscious disregard for human life.  (*Gonzalez*, *supra*, 54 Cal.4th at p. 653.)

What matters were the circumstances surrounding the gang assault against Christie, not whether the assault occurred within the confines of Guadalupe or outside the city limits.  There is no evidence that appellant was aware of the violent crime statistics for Guadalupe.  The People note that there is also no evidence "that appellant . . . believed a magical border around Guadalupe ensured that deadly gang violence only occurred outside the border."  When he was 17 years old, appellant was the victim of a gang-related stabbing in Guadalupe.

Appellant contends that the trial court erroneously excluded Dr. Barvosa's testimony comparing crime "statistics in Guadalupe with those in other jurisdictions such as Oakland." The People argue that the contention is forfeited because "the defense [never] asked to present crime statistics from 'jurisdictions such as Oakland,' let alone made an offer of proof as to what such statistics would have been."

In his reply brief appellant argues that the contention is not forfeited because in their written motion to exclude Dr. Barvosa's testimony, the People alleged, "[Appellant] proposes to have his expert use FBI statistics comparing Oakland to Guadalupe to support [his] claim that [he] would not have subjective knowledge to expect a homicide to occur." (Underlining omitted.)  But at the hearing on the People's motion

to exclude, neither defense counsel nor Dr. Barvosa indicated that they intended to introduce evidence of Oakland's crime statistics.  The only city they mentioned was Guadalupe, and the trial court's ruling pertained to Guadalupe's crime statistics.  Appellant's contention is forfeited because he failed (1) to make an offer of proof as to the relevance of Oakland's crime statistics (Evid. Code, § 354, subd. (a)); and (2) to secure a ruling on the statistics' admissibility.  (*People v. Rowland* (1992) 4 Cal.4th 238, 259 ["'[T]he absence of an adverse ruling precludes any appellate challenge.' [Citation.]  In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point"].)  In any event, for the same reasons that Guadalupe's crime statistics were irrelevant, a comparison of Guadalupe's and Oakland's crime statistics were also irrelevant.

*Exclusion of Defense Expert's*
*Testimony on "Validity Illusion"*

Pursuant to Evidence Code section 352, the trial court excluded Dr. Barvosa's testimony on the "validity illusion."  Dr. Barvosa explained:  "Validity illusion is a form of unconscious bias by which we as human beings will defer to a coherent story, a story that sounds good and whole, even if the story does not comport to or is supported by evidence."  "Validity illusion offers a story that obscures underlying facts that are verifiable."

As an example of the validity illusion, Dr. Barvosa cited Deputy Gonzales's alleged testimony "that all gangs reach the level of a syndicate type gang.  They are tight, cohesive organizations that make money through illicit, illegal activity."  Dr. Barvosa said "the testimony from [Deputy] Gonzales . . . is that [Guadalupe] is one of the more extreme syndicate type gangs . . . ."  The trial court responded, "I never heard the word

15

syndicate used by Deputy Gonzales at any point, and I can't remember him trying to amplify the Guadalupe gang as being on a par with the prison gangs . . . ." Another example of the validity illusion was Gonzales's alleged testimony that gang members cannot leave the gang.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion." (*People v. Holloway* (2004) 33 Cal.4th 96, 134.)

Appellant has failed to carry his burden of showing that the trial court abused its discretion. (See *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307 [burden is on appellant].) He did not explain to the trial court how Dr. Barvosa's testimony on the validity illusion would tend to disprove that he had acted with implied malice.

Moreover, appellant has not explained to this court how the exclusion of Dr. Barvosa's testimony "resulted in a miscarriage of justice." (Evid. Code, § 354.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Rodriguez corroborated Deputy Gonzales's testimony about gang culture

and the danger that the fight would escalate to a deadly level. (See *ante*, pp. 6-7.)

*Trial Court's Refusal to Give*
*Instruction on Accomplice Testimony*

Appellant maintains that the trial court erroneously denied his request to instruct the jury on accomplice testimony pursuant to CALCRIM No. 334. Defense counsel argued, "I think there's plenty of evidence that could suggest that Aguilera or Rodriguez could be an accomplice." "An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." (§ 1111.)

CALCRIM No. 334 provides that the testimony "of an accomplice that tends to incriminate the defendant should be viewed with caution." The instruction continues: "If you decide that a witness was an accomplice, then you may not convict the defendant of [the charged crime] based on his or her testimony alone. You may use testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if: [¶] 1. The accomplice's testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's testimony; AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime."

"'If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. [Citation.] But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. [Citation.]'" (*People v. Lewis* (2001) 26 Cal.4th 334, 369.)

17

The trial court determined that the evidence was insufficient as a matter of law to support a finding that Rodriguez or Aguilera had been an accomplice to the crime charged – Palomar's murder of Christie through a vicious knife attack. The trial court did not err. When Palomar asked Aguilera to get the knife from the vehicle, Aguilera refused. He "told [Palomar] to leave that shit in there." Rodriguez tried to stop the fight by putting himself between Christie and his pursuers. He told Christie to "'go inside [the store] with the cameras.'" Rodriguez hoped that the Guadalupe gang members would not assault Christie inside the store if they realized their actions were being recorded by surveillance cameras. Christie went inside the store, and Aguilera told him to stay there. Rodriguez and Aguilera disengaged from the fight by walking away toward Palomar's vehicle.

In his reply brief appellant states that Rodriguez and Aguilera "unsuccessfully attempted to defuse tensions and break up the fight." But in his opening brief appellant asserts that Aguilera's status as an accomplice is supported by Rodriguez's testimony that Aguilera threw a bottle at Christie. Even if Aguilera had been an accomplice, the failure to give CALCRIM No. 334 would have been harmless error. Rodriguez was not an accomplice, and his testimony was more than sufficient to convict appellant of implied malice murder. The trial court declared, "I don't see [Rodriguez] responsible for a murder. He tried to stop it. I don't see any acts in agreement [with the other Guadalupe gang members]." Not only was Rodriguez's testimony sufficient in itself to convict appellant, it corroborated Aguilera's testimony.

Finally, the refusal to give CALCRIM No. 334 was not prejudicial because Rodriguez's and Aguilera's testimony was

18

corroborated by Erica Venegas, who had a dating relationship with appellant. Venegas testified that appellant had told her "that he was involved in a fight" and that Palomar had stabbed someone. Appellant also told Venegas that "he [had] picked [the victim] up over his head." "'Corroborating evidence may be slight [and] may be entirely circumstantial' [citation], and although that evidence must implicate the defendant in the crime and relate to proof of an element of the crime, it need not be sufficient to establish all the elements of the crime." (*People v. Williams* (2008) 43 Cal.4th 584, 638.)

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


PERREN, J.


TANGEMAN, J.

James K. Voysey, Judge

Superior Court County of Santa Barbara

_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.